### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOEY STRAUSS**, *et al.,* | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:22-cv-52-RCL** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| *Defendant.* | |

### <u>MEMORANDUM OPINION</u>

This Opinion addresses claims brought by four sets of plaintiffs arising from three separate attacks allegedly perpetrated by agents of Iran-backed terrorist organizations in 2004 and 2005. All three attacks were allegedly carried out by the insurgents' use of explosively formed penetrators ("EFPs") to penetrate the hulls of, and detonate inside, vehicles driven by relatives of the plaintiffs.

The first attack took place on November 20, 2004 (the "First Attack") and injured Leon Botha, the brother of plaintiff Jacques Botha. The second attack took place on November 14, 2005 (the "Second Attack") and took the life of both Johannes Potgieter and Ignatius du Preez. Two sets of plaintiffs have brought claims arising from the Second Attack: the first set of plaintiffs is comprised of the Estate of Johannes Potgieter and his surviving family members, Iris Potgieter, Nicholas Potgieter, Johannes T. Potgieter, and Wessel Potgieter (the "Potgieter plaintiffs"). The Second Attack also gives rise to the claims of those plaintiffs who are family members of Ignatius du Preez: Adri du Preez, Stephne du Preez, Charne Bell, and Chantelle Botha (the "du Preez plaintiffs"). The third attack took place on December 22, 2005 (the "Third Attack") and took the

life of Johannes Strauss. This attack gave rise to the claims of Johannes Strauss's surviving family members, plaintiffs Joey Strauss, Jean Cameron, and Jacobus Strauss (the "Strauss plaintiffs").

The operative Second Amended Complaint alleges two counts against the defendant. First, it brings a claim on behalf of Plaintiff the Estate of Johannes Potgieter seeking damages for his wrongful death. Second Am. Compl. ¶¶ 124–134, ECF No. 30. Second, it brings claims on behalf of all other plaintiffs (the "Family Member plaintiffs") for intentional infliction of emotional distress ("IIED"). *Id.* at ¶¶ 135–144. For the reasons that follow, the Court will **GRANT** the plaintiffs' Renewed Motion [ECF No. 31] for Default Judgment and **APPOINT** Alan Balaran as a Special Master to take evidence from the plaintiffs and calculate their damages.

## I.    LEGAL STANDARD

### A. Default Judgment Standard

The Federal Rules of Civil Procedure and FSIA together establish the standard a court must apply in determining whether to award default judgment to a plaintiff proceeding against a foreign sovereign defendant. Federal Rule of Civil Procedure 55(a) requires the Clerk of the Court to enter a party's default if the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). However, "the entry of a default judgment is not automatic," and courts in FSIA cases must consider the evidence presented to it before entering a default judgment against no-show defendants. *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (internal citations omitted).

The FSIA instructs that courts may not enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish their claim or right to relief. *See*

2

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). But this requirement is not a free pass for courts to accept plaintiffs' assertions as true. Instead, courts are required to "inquire further before entering judgment" against foreign sovereign parties in default. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 171 (D.D.C. 2010) (citing *Oveissi v. Republic of Iran*, 498 F. Supp. 2d 268, 272 (D.D.C. 2007)). This Court can rely on, among other things, plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (Lamberth, C.J.) (quoting *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).

### B. Choice of Law

A federal court assessing state-law claims under the FSIA must apply the choice-of-law rules of the forum. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). In this case, the plaintiffs have sued in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4). D.C. employs a "constructive blending" of "governmental interest" analysis and the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995). Governmental interest analysis requires a court to (1) "identify[] the policies underlying the laws" of each potential jurisdiction, *In re APA Assessment Fee Litig.*, 766 F.3d 39, 52 (D.C. Cir. 2014), then (2) determine whether a jurisdiction's policy would be advanced "by having its law applied to the facts of the case under review." *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989). As part of this analysis, a court should also consider the jurisdiction with the "most significant relationship" to the dispute under the principles listed in the Second Restatement. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013);

*Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006).   According to the Second Restatement, for personal-injury actions, courts must take into account specific contacts between the venue claiming jurisdiction and the acts giving rise to the dispute.   These contacts include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." The law of the "state where the injury occurred" should govern unless another state has a "more significant relationship" to the dispute. RESTATEMENT (SECOND) OF CONFLICT OF L. § 145 (AM. L. INST. 1971).

## II.   PROCEDURAL HISTORY

The plaintiffs filed their initial Complaint in January 2022. Compl., ECF No. 1.   They invoked this Court's subject matter jurisdiction under the terrorism exception to foreign state sovereign immunity found at 28 U.S.C. § 1605A, and they sought monetary damages pursuant to the FSIA's private cause of action at § 1605A(c).   The plaintiffs' original claims can be sorted into two categories: (1) assault and battery on behalf of the Estate of Johannes Potgieter and Jacob Zuccaro and (2) intentional infliction of emotional distress on behalf of the Family Member plaintiffs.

As discussed in more detail below, the defendants were successfully served pursuant to 28 U.S.C. § 1608(a)(4) in September 2022.  In February 2023, the plaintiffs filed their First Amended Complaint, which brought no new claims but changed the name of a plaintiff to reflect her marriage.  First Am. Compl., ECF No. 20.  The plaintiffs filed their First Motion for Default Judgment in June 2023. Pl.'s First Mot. for Def. J., ECF No. 21 ("First Mot.").  This Court denied their Motion without prejudice in March 2024 and granted leave for the plaintiffs to correct and

refile their motion. Mem. Order, ECF No. 23. Most of the reasons for the Court's denial of the First Motion were deficiencies in the Complaint.

The Court highlighted three jurisdictional flaws in the plaintiffs' First Amended Complaint. First, the Court noted that the plaintiffs requested a jury trial in blatant disregard of the FSIA's grant of original jurisdiction to district courts only over "any nonjury civil action against a foreign state." *Id.* (citing 28 U.S.C. § 1330(a)). While the Court suspected that this was a simple drafting mistake, it cautioned the plaintiffs here and elsewhere to avoid "muddying the Court's jurisdiction on the front cover of their complaint." *Id.*

Second, the Court dismissed numerous claims made by the plaintiffs for lack of subject matter jurisdiction under the FSIA's terrorism exception. The Court explained that for the FSIA to abrogate a foreign state's sovereign immunity under the statute's terrorism exception, a plaintiff must (among other things) seek damages stemming from "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking," or the provision of material support for those activities. Mem. Order 2 (citing 28 U.S.C. § 1605A(a)(1)). A few weeks before the Court's Memorandum Order denying the first motion for default judgment in this case, the D.C. Circuit decided *Borochov v. Islamic Republic of Iran*. In *Borochov*, the D.C. Circuit held that the FSIA's requirement that plaintiffs' personal injuries arise from an "'extrajudicial killing' [means that] the perpetrator must have *actually killed* someone." *Id.* (citing *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024)). Because several of the EFP attacks in the original Complaint "did not result in any deaths," the Court dismissed the claims "stemming from those attacks where no one died." *Id.* at 3. Specifically, the Court dismissed the claims brought by plaintiffs Jacob Zuccaro, Jamie Zuccaro, Blake Darsaw, and Jacques Botha. *Id.* at 2–3.

The Court pointed out a third jurisdictional flaw in the plaintiffs' briefing on behalf of the Family Member plaintiffs. The Court first explained that the terrorism exception is only available to certain plaintiffs: U.S. nationals, members of the armed forces, employees of the United States government, and "individual[s] performing a contract awarded by the United States Government, acting within the scope of the employee's employment." 28 U.S.C. § 1605A(a)(ii). None of the decedents in this case was a citizen of the United States. And while the plaintiffs assert that their family members were contractors acting within the scope of their employment, they failed to provide the Court with satisfactory evidence that their family members killed in the EFP attacks were acting "within the scope" of their employment. Mem. Order 5.

In addition to these three jurisdictional flaws, the Court found that the plaintiffs failed to clear an important Article III hurdle: the Estate of Johannes Potgieter failed to present satisfactory evidence as to its standing to bring a claim for pain and suffering. *Id.* at 4 (citing 28 U.S.C. § 1608(e)). Estate plaintiffs in FSIA cases must establish that they have standing to maintain a cause of action for injuries that occurred during the decedent's life. *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014). And this Court noted that whether a plaintiff can maintain such an action "is a question that is 'governed by the law of the state which also governs the creation of the estate." Mem. Order 4 (citing *Worley*, 75 F. Supp. 3d at 333). The Court found that the plaintiffs had presented no evidence to establish what law governs the creation of the Estate of Johannes Potgieter. *Id.*

Finally, the plaintiffs failed to provide evidence satisfactory to the court as to the merits of their argument. *Id.* 5 (citing 28 U.S.C. § 1608(e)). The Family Member plaintiffs provided "no details" as to the injuries they suffered as a result of the attack. *Id.* at 5. The bulk of the claims alleged in the First Amended Complaint were IIED claims brought by the Family Member

plaintiffs. First Am. Compl. ¶¶ 132–142. While the First Amended Complaint and First Motion for Default Judgment painted a harrowing picture of the trauma suffered by these plaintiffs in the wake of their loved ones' deaths at the hands of terrorists, their allegations should be "supported by . . . documentary and affidavit evidence." *Valore*, 700 F. Supp. 2d at 59.

The Court denied the First Motion for Default Judgment without prejudice and granted the plaintiffs leave to refile their motion and address these issues. The plaintiffs then sought leave to file a Second Amended Complaint, which the Court granted. Order of May 21, 2024, ECF No. 27. The plaintiffs have now filed their Second Amended Complaint and Renewed Motion for Default Judgment. *See* Second Am. Compl.; Renewed Motion for Default Judgment, ECF No. 31 ("Renewed Mot."). The defendants, unsurprisingly for an FSIA case brought under the terrorism exception, did not respond. The Renewed Motion is therefore ripe for review.

### III.    FINDINGS OF FACT

#### A. Judicial Notice of the *Roberts* Opinion and Affidavit Testimony

The plaintiffs have asked this Court to take judicial notice of the findings of fact and conclusions of law made by this Court in the related case *Roberts v. Islamic Republic of Iran*, No. 20-cv-1227 (RCL) ("*Roberts*"), which itself relied in part on the findings in this Court's Memorandum Opinion in *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019). First Mot. 5–6. The Federal Rules of Evidence allow a court to take judicial notice of facts that are "not subject to reasonable dispute" either because they are "generally known within the trial court's territorial jurisdiction" or because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts in this district have taken "judicial notice of court records in related proceedings" when adjudicating FSIA cases that arise from a common set of facts and require expert testimony on similar issues. *Rimkus*, 750 F. Supp 2d at 171 (citing *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)).

While courts must be careful to avoid simply accepting any implications that arise from the existence of prior opinions, the validity of the judicial record itself is generally "not subject to dispute" and recognition of that record is therefore "a proper exercise of judicial notice." *Id.* at 172. However, it is still up the Court to determine the significance of that evidence in the case before it, and the Court must evaluate the implications of the prior cases of which it takes judicial notice and the allegations alleged in the complaint before it.

Here, the Court will take judicial notice of several sworn affidavits by experts whom the Court has already qualified in prior proceedings. *See* Mem. Op. 5–6, *Roberts*, ECF No. 24. In particular, the Court will refer to the expert affidavits of Michael Pregent and Donald Wade Barker admitted by the Court in *Roberts*. Mr. Barker was a member of the United States Army for fourteen years, during which time he oversaw the development and implementation of countermeasures to the proliferation and effectiveness of EFPs. *See* Expert Affidavit of Donald Wade Barker ¶ 2, *Roberts*, ECF No. 17-2 ("First Barker Aff."). He currently serves as CEO of the Tisdale Group, a defense company focused on producing technology to counter, among other weapons, EFPs. *Id.* ¶ 4. Mr. Pregent is a former intelligence officer who has served in various roles over a thirty-year career, including at the National Military Command Center at the Pentagon. Expert Affidavit of Michael Pregent ¶ 1–3, *Roberts*, ECF No. 17-1 ("Pregent Aff."). As discussed further below, these affidavits collectively provide evidence satisfactory to this Court of Iran's involvement in the creation and proliferation of EFPs throughout Iraq during the relevant time period. In addition to these expert affidavits, the Court will take judicial notice of the sworn affidavits of Leon Botha, Pierre Du Plessis, and George Kieser submitted in *Roberts* to make its factual findings regarding the First, Second, and Third Attacks, respectively. George Kieser has also provided crucial testimony regarding the fatal nature of the First Attack, which the Court will also judicially notice.

**B.  EFP Proliferation by Iranian-Backed Forces**

As with every case invoking the terrorism exception—the facts of this case shock the conscience and evoke sympathy for the victims and their families.  Each of the four victims in this case was an employee of a government contractor performing work to rebuild Iraq after the fall of Saddam Hussein in 2003.  The three decedents—Johannes Strauss, Johannes Potgieter, and Ignatius du Preez—worked for DynCorp as security contractors, escorting military members from the United States and its allies (the "Coalition") to and from the various projects throughout Iraq. Ex. 2, Decl. of Joey Strauss 8, Renewed Mot., ECF No. 31-3; *id.* Ex. 3, Decl. of Joey Strauss 9– 11.  Leon Botha was likewise part of a "personal security detail for a [unspecified] United States government contractor."  Decl. of Leon Botha ¶ 1–2, *Roberts*, ECF No. 17-12.

Iran almost immediately began to impede these efforts.  It dispatched a group of trained Iraqi Shia exiles known as the Badr Corps to infiltrate the rebuilding Iraqi security forces, and it supported a national militia known as Jaysh al-Mahdi ("JAM") that threatened the Coalition forces, including government contractors like the victims in this case.  Soon after the Coalition began its work of rebuilding Iraq, Iran provided "tactical and material support to these two groups in their efforts to undermine the ongoing Coalition mission in Iraq."  Pregent Aff. ¶ 31.  In addition to the Badr Corps and JAM, two other groups fought against the Coalition's efforts to rebuild and stabilize the new Iraqi army: Hezbollah, a terrorist organization supported by Iran since the 1979 Iranian revolution, and the Islamic Revolutionary Guard Corps Qods Force ("IRGC-QF"), a pseudo-governmental military organization reporting directly to the Supreme Leader of Iran.  *Id.* ¶¶ 15, 23.

Hezbollah and the IRGC-QF were primarily responsible for most of the EFP attacks against U.S. interests in Iraq during the mid-2000s.  *Id.* ¶ 37.  EFPs are designed for the express purpose

of penetrating the armor of military vehicles. First Barker Aff. ¶ 11. Their design is simple: one end of a steel pipe is welded shut with a steel plate, creating what is essentially a fixed mass at that end. The open end of the pipe is packed with explosive material known as C-4 and then closed with a specially manufactured copper plate. *Id.* ¶ 17. As Donald Barker explains, this design is "highly effective against armored vehicles because of [the] ability to focus the energy of an explosive blast into a plate of metal, forming that metal into the shape of a slug." *Id.* ¶ 15. Copper is considered the perfect metal for EFPs because "its melting point is just below the maximum detonation temperature of C-4 and other similar explosive materials," meaning it can form the requisite slug shape needed to penetrate armor without completely melting from the blast. *Id.* ¶ 19.

Simply knowing the science behind EFP detonation is not enough to make them effective against modern armored vehicles. Obtaining the knowledge to mill the copper plate so that it is the right amount of thickness—neither "too thin so as to shatter or too thick so as to fail to take the desired shape"—requires specific training and equipment. *Id.* ¶ 20. And once one has the correct materials (C-4, copper, and steel pipes) and training to create an EFP, they still must know how to strategically place and disguise the devices to avoid detection. One common way of disguising EFPs has been to "remov[e] a portion of curb from the side of the roadway and replacing it with an EFP array that was painted to match the adjacent curb." *Id.* ¶ 23.

The first known use of the EFP by Hezbollah was against the Israeli Defense Forces in 1998, and it was "introduced . . . to [anti-Coalition] Iraqi militias in 2004 for use against American and Coalition up-armored vehicles." Pregent Aff. ¶ 38. And as the Coalition's military presence escalated during the rebuilding of Iraq, "the EFP became the signature weapon of Iranian-sponsored Iraqi militias." *Id.* In 2006, Coalition forces discovered a large cache of copper plates "specifically designed for use in EFP devices." *Id.* ¶ 41. As additional discoveries of these caches

were made, Coalition forces could "confirm[] Iran's continued infusion of EFP devices into Iraq." *Id.* (citations omitted).

The materials, assembly training, and strategic thinking behind EFP placements were all provided to Iraqi Shia militants by Hezbollah and Iran. In addition to the caches of copper plates found in Iranian mines, the United States military has confirmed that Iran trained militants to assemble and deploy EFPs through interrogation of detainees. First Barker Aff. ¶ 23. Additionally, the military has determined that the quantity and quality of explosive material required for EFPs to function effectively "was not readily available to Iraq's Shia militants without Iranian sponsorship." *Id.* ¶ 30. Furthermore, the level of sophistication required to adapt the EFPs to "the technological complexity" of the Coalition's response to EFP detonations would not have been possible "without the active involvement and oversight of the IRGC and Hezbollah." *Id.* ¶ 33. With this background established, the Court will review the evidence submitted for the three attacks.

### C. The First Attack

Leon Botha is a citizen of South Africa who, at the time of the First Attack, "was working in Iraq as a member of a personal security detail for a United States government contractor." Decl. of Leon Botha ¶ 1–2, *Roberts*. On November 20, 2004, he and his team escorted a United States government group as part of their duties. Leon Botha was driving the second of four vehicles in the convoy. *Id.* During their return voyage, an EFP detonated next to their vehicles, piercing Leon's vehicle and injuring several of the occupants. *Id.* ¶ 6. This was one of the first instances of an EFP being used in Iraq. *Id.* ¶ 9. An investigation revealed copper residue on the targeted vehicle, which "confirmed . . . that an EFP was used as part of the attack." *Id.* ¶ 11. The investigation concluded that Iranian diplomatic personnel likely perpetrated the attack, both

because of the presence of copper residue consistent with Iranian-backed EFP explosions and because the attack took place in front of the Iranian Embassy compound. *Id.*

George Kieser was working for the same security contractor as Leon Botha and was present during the First Attack, where he saw the EFP detonate next to their convoy and a nearby civilian vehicle. Supplemental Affidavit of George Kieser ¶ 3, ECF No. 31-15. According to Mr. Kieser, "several individuals inside that vehicle died instantly," and he returned as part of the investigative team to find "the burned-out shell of that vehicle." *Id.* Leon Botha's Supplemental Affidavit in this case includes a picture of that burned-out shell as well as a picture of the vehicle he was driving, which shows "human brain matter stuck to the front" of the vehicle. Botha Aff. ¶ 5, ECF No. 31-14.

### D. The Second Attack

The Second Attack occurred on November 14, 2005, outside the Iranian Embassy. A four-vehicle escort convoy led by affiant Pierre Du Plessis passed by the Embassy and triggered an EFP. Du Plessis Aff. ¶¶ 5–6, *Roberts*, ECF No. 17-14. The fourth vehicle was hit directly by the EFP, "causing it to immediately burst into flames." *Id.* ¶ 6. Johannes Potgieter and Ignatius du Preez were both killed in the attack. *Id.*

### E. The Third Attack

The Third Attack took the life of Johannes Strauss on December 22, 2005. Mr. Strauss was on security detail for a United States government contractor when his vehicle was struck by an EFP. Shrapnel from the EFP penetrated both the passenger side and driver side of the vehicle in which Mr. Strauss was traveling. The blast killed Mr. Strauss, who was pronounced dead at the scene by the time Mr. Kieser, his colleague, arrived to investigate the blast and document its damage. Affidavit of George Kieser ¶4, ECF No. 21-4.

### F. Scope of Employment

As mentioned *supra*, to succeed on their default judgment motion, the Family Member plaintiffs must provide evidence that their deceased family members were government contractors *acting within the scope of their employment* at the time they were killed. As noted above, three decedents' status as government contractors acting within the scope of their employment is at issue: Ignatius du Preez, Johannes Strauss, and Johannes Potgieter. The Court will address the evidence submitted by plaintiffs for each of these individuals in turn, finding that the evidence is sufficient to show that each decedent was acting within the scope of their employment at the time they were killed and is thus eligible for relief under the terrorism exception.

The plaintiffs submit several evidentiary documents to prove that Ignatius du Preez was a government contractor operating within the scope of his employment when he was killed. First, Mr. du Preez's wife Adri du Preez submits an affidavit in which she recalls being informed of her husband's passing. Decl. of Adri du Preez 2, Renewed Mot., ECF No. 31-2. She recalls being informed by a company representative that her husband "died while acting in the line of duty." *Id.* While this would normally constitute hearsay evidence, the Court in FSIA cases may rely on plaintiffs' "uncontroverted factual allegations" as long as those allegations are supported by "documentary and affidavit evidence." *Valore*, 700 F. Supp. 2d at 59. Counsel for Mrs. du Preez claims that her assertions are supported by a "Department of Health Letter." Renewed Mot. 5. However, the letter does not appear anywhere in the Motion or exhibits, and its absence calls into question whether enough documentary evidence has been submitted to substantiate the du Preez plaintiffs' claims. Luckily for the du Preez Plaintiffs, the Court has identified in the record an email from Ignatius du Preez's employer sent on May 28, 2010, listing him among those employees who "lost their lives while carrying out their duties." Ex. 2, Decl. of Joey Strauss 7–8,

Renewed Mot. ("Memorial Day Email"). Together with Mrs. du Preez's affidavit statement, the Memorial Day email provides evidence satisfactory to the Court that Ignatius du Preez was "an individual performing a contract awarded by the United States Government, acting within the scope of" his employment and therefore a proper plaintiff under the terrorism exception. 28 U.S.C. § 1605A(a)(2)(A)(ii).

The Memorial Day Email also saves the claims of Johannes Potgieter, as it provides the only documentary evidence that he was a government contractor acting within the scope of his employment. *See* Memorial Day Email (listing Johannes Potgieter as among those who "gave their lives" in the "honorable service" of "build[ing] a better world"). Iris Potgieter, the wife of Johannes Potgieter, provides affidavit testimony that her husband was killed "while carrying out a security contract on behalf of the United States." Decl. of Iris Potgieter 1, Renewed Mot., ECF No. 31-6. The Memorial Day Email and the sworn statement of Mrs. Potgieter satisfy the Court that Johannes Potgieter was acting within the scope of his employment as a contractor with the United States government at the time of his death.

Lastly, the Strauss plaintiffs provide the most documentary and affidavit evidence that Johannes Strauss was acting within the scope of his employment when he was killed. First, they provide an affidavit from Johannes Strauss's wife Joey in which she states that he died "while carrying out a security contract on behalf of the United States government." Decl. of Joey Strauss 1. They also submit a letter from Johannes Strauss's employer DynCorp International in which the company states that Johannes "worked daily to protect those working to rebuild and reestablish Iraq," which permits the Court to draw the reasonable inference that he was so engaged at the time his convoy was allegedly attacked. *Id.* Ex. 2. Most tellingly, the Strauss plaintiffs include an email from DynCorp International stating that Johannes Strauss was killed "when his armored vehicle

was hit by an improved explosive device" while he and his team "were providing security as part of a convoy that was transporting US corrections officials to Baqubah for prison inspections." *Id.* Ex. 3. Taken together, these two documents and Mrs. Strauss's affidavit testimony provide satisfactory evidence that Johannes Strauss was killed while acting within the scope of his employment as a government contractor for the United States. The Court will therefore move on to analyze the plaintiffs' claims.

## IV.    CONCLUSIONS OF LAW

### A.  Subject Matter Jurisdiction

#### 1.  This Court Has Original Jurisdiction Under § 1330(a)

"For the better part" of the first two centuries of our nation's existence, the Executive branch requested that courts grant immunity to foreign states involved in suits before them. *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014). However, in 1976 Congress "replac[ed] the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's ["FSIA"] 'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *Id.* at 141 (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). Under the new FSIA regime, though, sovereign immunity is still the default in civil actions such as this one. 28 U.S.C. § 1604 (explaining that, subject to certain exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States"). Therefore, the FSIA only bestows on district courts original jurisdiction over (1) nonjury civil actions; (2) commenced against a foreign state; (3) for claims seeking relief *in personam*; (4) where the foreign state is not entitled to immunity under sections 1605 or 1607 of the FSIA or under any applicable international agreement. 28 U.S.C. § 1330(a).

Here, the first three requirements of Section 1330(a) are met. As mentioned above, the plaintiffs initially fumbled the ball with the first requirement by requesting a jury trial in the First Amended Complaint. However, this deficiency was easily cured in the Second Amended Complaint: the plaintiffs no longer seek a trial by jury. *Compare* First Am. Compl. 1, *with* Second Am. Compl. Second, Iran is a "foreign state" within the meaning of the FSIA. 28 U.S.C. § 1603(a). Third, the claims are against the Iran as a legal entity and the claims therefore seek relief *in personam*.

The fourth prong of the Section 1330(a) analysis requires the Court to consider whether a foreign state is nevertheless immune from suit under sections 1605 or 1607. The plaintiffs here seek to invoke this Court's subject matter jurisdiction based on the so-called terrorism exception to sovereign immunity. Section 1605A of the FSIA lays out requirements both for abrogation of sovereign immunity under the terrorism exception and for courts to hear the claims of the plaintiffs. For the reasons set forth below, the Court finds both that the statutory requirements for abrogation of sovereign immunity and the requirements for a claim to be heard are met here, and the Court may therefore exercise subject matter jurisdiction over the claims.

### 2. Subsection 1605A(a)(1)—Abrogation of Immunity

Subsection 1605A(a)(1) states that a foreign state "shall not be immune from the jurisdiction of the courts of the United States or of the States in any case . . . [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). The first, second, and third requirements are self-evidently met here. First, the plaintiffs in this case seek monetary damages against the defendants. Second Am. Compl. 23–24. They seek this relief against Iran, a

foreign state as defined by the FSIA. The Family Member plaintiffs seek damages for the pain and suffering they have experienced, while the Estate of Johannes Potgieter seeks pain and suffering damages for the death of Johannes Potgieter. *Id.*

However, it is not so immediately clear whether the fifth requirement—that the actions of the foreign state were acts of extrajudicial killings—is met for the First Attack. And since the fourth requirement, causation, is predicated on a finding of extrajudicial killing, the Court must first find that an extrajudicial killing occurred. The FSIA defines "extrajudicial killing" the same way that section 3 of the Torture Victim Protection Act of 1991 does. 28 U.S.C. § 1605A(h)(7). That section, in turn, defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102–256, § 3(a), 106 Stat. 73.

In its previous Memorandum Order, the Court dismissed Plaintiff Jacques Botha's claims because they arose out of the First Attack, in which the evidence introduced showed that Botha's brother Leon "was *injured* by an EFP attack" but for which there was no evidence that "Leon or anyone else *died* in that attack." Mem. Order 3 (emphasis added). In the Renewed Motion, Botha now asserts that while his brother Leon did not die in the First Attack, "at least one by-stander was killed during this attack, thereby satisfying the definition of 'extrajudicial killing' under *Borochov*." Renewed Mot. 3. As evidence in support of this claim, Botha submits two supplemental affidavits from plaintiffs in *Roberts*.

The first affidavit was submitted by Jacques Botha's brother Leon, who suffered serious injuries as a victim of the First Attack. In the affidavit, Leon recalls the First Attack and testifies that it was his "immediate understanding that all of the occupants of that vehicle would have died

instantly." Supplemental Affidavit of Leon Botha, Renewed Mot. Ex. 14 ¶ 4, ECF No. 31-14 ("Leon Aff."). Leon's affidavit also includes two pictures. The first is a picture of a white vehicle, which Leon testifies "was taken to memorialize the discovery of human brain matter stuck to the front of our vehicle as a result of the explosion." *Id.* The second picture depicts the crumpled shell of "the civilian vehicle that was completely destroyed by the explosion." *Id.* ¶ 6. The second affidavit was submitted by Mr. Kieser, another subcontractor who was a plaintiff in *Roberts* but not in this case. See Compl., *Roberts*, ECF No. 1. He testifies that he was present at the First Attack and saw the EFP detonate. Leon Aff. ¶ 1. He further testifies that he saw several individuals inside the civilian vehicle die instantly. *Id.* The plaintiffs submit that these two affidavits, coupled with the evidence considered by this Court in *Roberts*, should lead the Court to now find that Leon Botha's injuries were caused by an extrajudicial killing.

Upon review of the affidavits submitted by the plaintiffs and the pictures included therein, the Court finds that the First Attack did constitute an extrajudicial killing. All that remains of the civilian car depicted in a picture in Leon Botha's affidavit is a hollow shell. *Id.* ¶ 6. Any people inside the car when the EFP detonated would have died instantly. Like the heavily armored military Suburban vehicles depicted in pictures here and in other cases the Court has seen, the windows of this civilian vehicle were completely blown out. *Id.* Unlike those heavily armored suburban vehicles, the civilian vehicle had no armor. *Id.* The frame of the civilian car is more mutilated than those of the military-grade vehicles, and the hood of the car appears to have caved in from the force of the blow. *Id.* Comparing the state of this vehicle to the heavily armored military vehicles struck by EFPs in the other attacks described in the Complaint, which had holes in the windows from where the shrapnel entered the cabin and killed the passengers inside, it is more likely than not that the passenger(s) inside the civilian vehicle would have been killed by an

EFP blast. The affidavits of Leon Botha and George Kieser provide the Court with satisfactory evidence that it is more likely than not that there were, tragically, individuals inside the civilian vehicle at the time of the explosion. The pictures submitted as part of those affidavits lead the Court to only one conclusion: the individuals inside the civilian vehicle perished in the attack. The First Attack was therefore an extrajudicial killing and satisfies the fourth requirement for abrogation under § 1605A(a)(1).

The only remaining question is whether the act of extrajudicial killing "caused" the personal injury to the Family Member plaintiffs and the death of Johannes Potgieter. The answer is clearly yes. The FSIA does not incorporate a "but-for" standard of causation; that is, plaintiffs "need not show that their injuries would not have occurred 'but for' defendants' actions." *Worley*, 75 F. Supp. 3d at 325 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir.2004)). Instead, this element "is established by showing 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Id.* (citing *Valore*, 700 F. Supp. 2d at 66).

As mentioned, each of the three attacks was carried out by the use of an EFP, which Hezbollah had access to only because of the training, financing, and provision of materials by Iran. Each of the three attacks bore signatures of Iranian support. The "presence of copper slugs" in the First Attack leaves strongly suggests that the attack was perpetrated with the assistance of Hezbollah and the IRGC. First Barker Aff ¶ 42. The assailants in the Second Attack utilized "EFP warheads encased in concrete," which they placed in sections of concrete on the road so as to blend in. Expert Affidavit of Donald Wade Barker ¶ 43, ECF No. 21-3 ("Second Barker Aff.").[1] The

---

[1] Note that Barker submitted a new affidavit for the present case. While much of his testimony in this affidavit reflects his prior statements in the affidavit for the *Roberts* case, there are new statements relevant to this case, including the one preceding this footnote. The Court therefore refers to the affidavit submitted for this case as the Second Barker Affidavit.

technique of encasing EFP warheads in concrete "has been regularly used by anti-Iraq and anti-Afghan forces that are trained by the Iranians." *Id.* And the cars destroyed in the Third Attack had "a couple of indentations that . . . left copper residue behind," which indicate the use of Iranian-backed EFPs. *Id.* ¶ 52. Each of these attacks was the culmination of years of planning by anti-Iraqi agents operating on behalf of Iran. Iran's financial support for these agents of evil and their provision of supplies to create EFPs is more than enough of a "reasonable connection" to the damages suffered by the victims of these attacks for the Court to find the plaintiffs' injuries were caused by Iran's actions. Because the requirements of Section 1605A(a)(1) are met, the Court finds that Iran has abrogated the sovereign immunity of a foreign state.

### 3. Section 1605A(a)(2)—Requirements for a Claim to Be Heard

Even when the requirements of § 1605A(a)(1) are met, a district court must still find that the requirements of § 1605A(a)(2) are also met to exercise subject matter jurisdiction. Namely, the requirements for a claim under the terrorism exception to be heard are that (i) the foreign country was designated a "state sponsor of terrorism at the time [of] the act," (ii) the claimant or the victim was a "national of the United States . . . a member of the armed forces; or . . . otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at that time, and (iii) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2).

The first and third requirements are easily satisfied. Iran has been designated a state sponsor of terrorism since January 19, 1984, and therefore meets the first requirement. U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/

[https://perma.cc/GV7N-ER27]. And the third requirement is not relevant here as all three attacks took place in Iraq, which is not "the foreign state against which the claim has been brought." Therefore, the plaintiffs were under no obligation to afford Iran a reasonable opportunity to arbitrate.

The second requirement under § 1605A(a)(2) operates as a jurisdictional bar that allows only certain types of plaintiffs to proceed under the terrorism exception. As discussed *supra*, the Court has found that each of the victims in these attacks were acting within the scope of their employment. Therefore, all three requirements for a claim to be heard have been met in this case, and the terrorism exception accordingly applies.

The Court will briefly address other potential statutory barriers to adjudicating this matter: Personal Jurisdiction, Timeliness, and Venue. After confirming that none of those barriers present an obstacle here, the Court will proceed to its analysis of the Estate's and the Family Member plaintiffs' claims.

**B.  Personal Jurisdiction Over Iran**

Courts adjudicating FSIA cases must assure themselves not only of subject matter jurisdiction but also of personal jurisdiction over the defendants. 28 U.S.C. § 1330. To exercise personal jurisdiction over a foreign defendant under the FSIA, courts must find that service has been properly made under Section 1608 of the FSIA. *Id.* § 1330(b). Section 1608 provides four acceptable methods of service "upon a foreign state or political subdivision of a foreign state:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into

the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The plaintiffs attempted service under the first three provisions to no avail. Notice of Failed Service, ECF No. 10. Therefore, they filed an affidavit requesting foreign mailing and sought to have service effectuated under cover of diplomatic note pursuant to § 1608(a)(4). They succeeded, and Iran was served on September 26, 2022. Return of Service 1, ECF No. 14. The Court may therefore exercise personal jurisdiction over the defendant.

### C. Venue is Proper in This Court

For civil actions 'against a foreign state or political subdivision thereof,' venue is proper "in the United States District Court for the District of Columbia." 28 U.S.C. § 1391(f)(4). Iran is a foreign state as defined by the FSIA. *Id.* § 1603(a). Venue is therefore proper in this District.

### D. The Court Will Not Bar the Plaintiffs' Late Claims Under Section 1605A(b)

Section 1605A also includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained." 28 U.S.C. § 1605A(b). The statute of limitations bars claims brought later than "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b)(2). The attacks giving rise to this action took place between November 2004 and December 2005, so at the latest the plaintiffs'

causes of actions arose in 2005. *Amobi v. Dist. of Columbia Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury"). The plaintiffs filed their Complaint in January 2022, far past the ten-year limitations period contemplated by the statute. The plaintiffs' claims would, therefore, appear to be barred.

However, this Court has held that Section 1605A's limitations provision is not jurisdictional. *See Worley*, 75 F. Supp. 3d at 328. Because statutes of limitations "are typically treated as affirmative defenses that may be waived if not timely raised by that party," the Court has held that where, as here, the defendants do not appear in court to raise these affirmative defenses, the claims may proceed. *Id.* (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)). The Court certainly believes that the "interests of justice would be better served" here by addressing the merits of the plaintiffs' claims than dismissing them as barred by the statute of limitations. *Day v. McDonough*, 547 U.S. 198, 208 (2006). However, the Court will admonish plaintiffs' counsel that it does not take lightly the omission of briefing on any of the statutory requirements for claims under § 1605A. While this Court may be familiar with the requirements of the FSIA, it is incumbent upon *plaintiffs*, not the Court, to ensure that all the requirements are met for a claim to be heard and no statutory provision otherwise bars relief.

### E. Iran is Liable to The Estate of Johannes Potgieter Under the Private Right of Action in § 1605A(c)

In its previous Memorandum Order, the Court dismissed the assault and battery claims of the Estate of Johannes Potgieter from the First Amended Complaint because it had not shown that it had standing to sue. Mem. Order 4. The Estate has not sought to reassert those claims here, acknowledging that "it appears most likely that Johannes Potgieter died instantaneously, making any claim for pain and suffering on behalf of his estate unsuitable." Renewed Mot. 4. The Estate

now seeks economic damages stemming from the wrongful death of Johannes Potgieter. As the Court will now explain, the Estate has cured its standing issue and may proceed against Iran under the FSIA's private right of action.

Section 1605A creates a private right of action against countries deemed state sponsors of terrorism by the State Department. Prior to the enactment of § 1605A, plaintiffs had to prove that defendants were liable under specific state-law claims under the now-repealed provision of the FSIA found at § 1605(a)(7). As a result, "most terrorism victims who pursued FSIA cases against Iran were in fact able to litigate claims based on the tort law of the state jurisdiction where they were domiciled at the time of the terrorist incident giving rise to the lawsuit." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 46 (D.D.C. 2009) (Lamberth, C.J.). While this approach worked for most victims of state-sponsored terrorism, "hundreds of other[] . . . plaintiffs had their claims denied because they were domiciled in jurisdictions that did not afford them a substantive claim." *Id.* at 47.

Congress changed the legal landscape for terrorism victims with its enactment of § 1605A in 2008. National Defense Appropriations Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (repealing § 1605(a)(7) and replacing it with § 1605A). The most sweeping change wrought by this enactment was to subject state sponsors of terrorism "to a federal cause of action for money damages if those terrorist states cause or otherwise provide material support for an act of terrorism that results in the death or injury of a United States citizen or national." *In re Terrorism*, 659 F. Supp. 2d at 59 (citing 28 U.S.C. § 1605A(c)). This private right of action brought about a "crucial change in the law" for victims of state-sponsored terrorism, who were previously unable to rely on state tort law to create a cause of action. *Id.*

24

Section 1605A(c) allows plaintiffs to recover "economic damages, solatium, pain and suffering, and punitive damages" for any personal injury or death described in § 1605A(a)(1). 28 U.S.C. § 1605A(c). It provides that state sponsors of terrorism "shall be liable" to United States nationals, members of the armed forces, government employees, government contractors acting within the scope of their employment, or the legal representative of such persons "for personal injury or death caused by acts described in § 1605A(a)(1)." 28 U.S.C. § 1605A(c). Subsection (a)(1), in turn, contains the terrorism exception to sovereign immunity. As numerous courts in this district have noted, determining liability under § 1605A(c)'s private cause of action is "essentially the same" as determining the immunity-abrogation question in subsection 1605A(a)(1). *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 54 (D.D.C. 2018) (citing *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 155 (D.D.C. 2010)). The "overlap between the elements of [the private] cause of action [in § 1605A(c)] and the terrorism exception to foreign sovereign immunity" means that if a member of one of the classes named in § 1605A(c) brings claims that satisfy the terrorism exception, then the defendant's liability is automatically established. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).

Nevertheless, plaintiffs must still prove a "theory of liability" for their injuries. *Roth*, 78 F. Supp. 3d at 399. Here, the plaintiffs seek recovery on a wrongful death theory. Renewed Mot. 4–5. The Court has previously determined that an estate-plaintiff, as the legal representative of an entity with standing to bring claims under § 1605A(c), may bring a wrongful death action "for economic losses which result from decedent's premature death." *Valore*, 700 F. Supp. 2d at 78. Here, the Court has already determined that Johannes Potgieter was a government contractor acting within the scope of his employment. *See supra* IV.A.3. And his estate has met the requirements for the terrorism exception to abrogate sovereign immunity and establish his claims. *See supra*

IV.A.2. Therefore, Iran is liable to the Estate of Johannes Potgieter under the private cause of action for his wrongful death.

### F. Iran Is Liable to the Family Members for IIED

None of the Family Member plaintiffs is a citizen of the United States, so the federal cause of action in § 1605A(c) is not available to them. However, courts have made clear that § 1605A "did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity" that existed under § 1605(a)(7) prior to the 2008 enactment of the private cause of action. *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 20 (D.D.C. 2011) (Bates, J.). And because Iran's immunity is waived in this case, the Court may consider whether Iran is liable to the plaintiffs for their injuries under the laws of the appropriate jurisdiction. In determining liability for plaintiffs' non-federal claims under the FSIA, the D.C. Circuit has "instructed federal [district] judges to find relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). But before the Court can find the relevant law, it must first determine where to look. That is, it must engage in a choice-of-law analysis to determine whose law to apply: the law of the forum (D.C.); the law of the plaintiffs' domicile (South Africa); or the law of the place where the wrong occurred (Iraq). After conducting the choice-of-law analysis, the Court will conclude that South African law controls.

As stated above, this Court must apply the choice-of-law rules of the forum, which in all FSIA cases is the District of Columbia. 28 U.S.C. § 1391(f)(4); *see also Oveissi*, 573 F.3d at 841. D.C. employs a "constructive blending" of "governmental interest" analysis and the "most significant relationship" test of the Second Restatement. *Coleman*, 667 A.2d at 816. The Family Member plaintiffs argue that D.C. law should apply to their IIED claims. First Mot. 33–35. They argue that under the government interest analysis, "there is a unique and compelling reason for the

domestic law of the United States to apply" to their claims— namely, that "the EFP Attacks were specifically directed against American interests and the United States." *Id.*

While it is true that the EFP attacks were perpetrated by foreign enemies of the United States, the plaintiffs conflate the policy interests of the *United States* with the policy interests of the *District of Columbia*. Although Washington, D.C. houses the seat of the federal government, it also has its own standalone legislature and court system that are distinct from the federal government. The Constitution grants to Congress the power to "exercise exclusive legislation in all cases whatsoever over" the District of Columbia. U.S. CONST. art. I, § 8, cl.17. For much of our nation's history, Congress did directly legislate in D.C. If that were still the case, and Congress had passed the FSIA while the United States District Court for the District of Columbia had established the elements for an IIED claim under D.C. law, the use of D.C. law to adjudicate plaintiffs' claims might make more sense. But in 1973, Congress "delegate[d] certain legislative powers to the government of the District of Columbia" and "vested in the District of Columbia Court of Appeals" the "judicial power of the District." District of Columbia Home Rule Act, Pub. L. No. 93-198, § § 102, 431, 87 Stat. 774 (1973). The D.C. Home Rule Act established the District of Columbia Council and District of Columbia courts, which work in tandem to establish and clarify the laws of the District of Columbia.

The Family Member plaintiffs do not—and indeed, as explained above, *cannot*—invoke federal law for their claims. Instead, they rely on an IIED theory established by the District of Columbia Court of Appeals. First Mot. 35–36 (citing *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)). There is a clear distinction between the local D.C. government, whose courts have established the IIED theory upon which the plaintiffs rely, and the federal government, which represents the interests and values of our nation that the defendant seeks to destroy. Therefore, the

Court must consider the policy interests of the D.C. local government, rather than the federal government, in its analysis. The plaintiffs give no reason why the District of Columbia government would have any interest in compensating foreign citizens for injuries they suffered while employed by contractors operating on behalf of the United States government. It does not appear to this Court that any such reason exists.

Turning to the second part of the choice-of-law analysis, South Africa has the most significant relationship to this dispute. In conducting the most-significant-relationship analysis, courts consider the contacts a forum has with the parties and the dispute. "Contacts to be taken into account . . . include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation, and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Coleman*, 667 A.2d at 816 (citing RESTATEMENT (SECOND) OF CONFLICT OF L. § 145)

Although the conduct causing the plaintiffs' injuries in this case occurred in Iraq, Iraq's "relationship cannot be said to be *more* significant than that of the Family Member Plaintiffs' domicile countries." Mem. Op. 10, *Roberts*, ECF No. 47. This is because the first factor (the place where the injury occurred) and the third factor (the domicile of the parties) cut in favor of applying South African law. The plaintiffs' domiciles are South Africa, and their injuries, which they describe as "severe emotional distress," Second Am. Compl. 22, are felt by the plaintiffs in South Africa. Indeed, courts in this district have recognized that in terrorism-exception cases, "the plaintiffs' domicile often has a more significant relationship to the dispute than the law of the place of the conduct giving rise to the injury." *Id.* (citing *Dammarell v. Islamic Republic of Iran*, No. 01-cv-2224 (JDB), 2005 WL 756090, at *20 n.17 (D.D.C. Mar. 29, 2005)). The same is true here.

The Court must therefore turn to South African law to find a relevant theory under which the plaintiffs can prevail on their claims. South African law has an IIED analogue, which they style "emotional shock." The plaintiffs point the Court to a memorandum from Tzvi Brivik, a personal injury attorney in South Africa upon whose opinion the Court relied in *Roberts*. Brivik Mem., Ex. 2 to Renewed Mot. for Default J., *Roberts*, ECF No. 35-3. The elements of emotional shock are: "(1) a voluntary act causing emotional shock; (2) factual and legal nexus between the voluntary act and the harm; (3) wrongfulness, that is, conduct causing 'relatively ser[i]ous physical or mental harm'; (4) fault; and (5) damage, specifically 'personality infringement, pain and suffering, [or] patrimonial loss.'" Brivik Mem. ¶ 11.

Given this legal framework, the plaintiffs have established their right to relief under South African law. The Court has already found that Iran took deliberate, voluntary acts throughout the early 2000s to support anti-Coalition insurgents operating in Iraq. *See supra*. There is a factual and legal nexus between that material provision of support and the injuries suffered by the plaintiffs, and the injuries suffered by the plaintiffs are undoubtedly serious. The Court has already determined that Iran is at fault for the death of the decedents.

The anguish and pain that the Family Member plaintiffs have suffered since losing their loved ones is clear from their statements, and they are affected by the traumatic loss of their loved ones to this day. The plaintiffs describe their continued reliance on medication for insomnia and anxiety, while the children of the decedents struggled in school. At least one had to attend anger management classes in the wake of his father's death and throughout his high school years. The Potgieter plaintiffs' loss was compounded shortly after the attacks, as Johannes Potgieter's brother committed suicide two months after Johannes's death, leaving Johannes's children and widow even more emotionally unstable. Johannes's son Nicholas describes "reliving [his] father's death

29

all over again" just two months after his father died. The evidence presented by these declarations provides the Court with satisfactory evidence of the plaintiffs' pain and suffering. Iran is therefore liable to the Family Member plaintiffs under South African law for the intentional infliction of emotional shock.

## V.    DAMAGES

The Court has authority to "appoint special masters to hear damage claims brought" under § 1605A. 28 U.S.C. § 1605A(e)(1). The Court does not have sufficient evidence before it to assess the plaintiffs' damages. The Court will therefore appoint a special master pursuant to its authority under the FSIA. The special master shall take evidence and timely file a report and recommendation as to the amount of damages to which each plaintiff shall be entitled. Given the inadequacy of previous filings by plaintiffs' counsel, the Court underscores once again that the attorneys for the plaintiffs must ensure they have all relevant evidence related to the damages calculations ready in a timely manner for the special master. Undue delay will not help these plaintiffs, who require a final determination as to their damages before they can seek monetary relief.

The Court appointed Special Master Alan Balaran in the related case. Order of July 31, 2023, *Roberts*, ECF No. 52. The plaintiffs in this case have consented to the appointment of Special Master Balaran for this case, and the Court believes his selection would be appropriate given his familiarity with the facts of this case and his general knowledge of this Court's expectations of a special master. The Court will therefore appoint Alan Balaran as Special Master in this related case.

## VI.    CONCLUSION

The Family Member plaintiffs will feel the loss of their loved ones for years to come. As with all FSIA cases arising out of the terrorism exception, the Court's entry of default judgment

for the plaintiffs will not ease this pain or return their loved ones.  However, the Court hopes that this award helps to alleviate their injury and aid them into the road to recovery.

The Court will refer to the Special Master the consideration of compensatory damages and defer consideration of punitive damages until such time as the Special Master has issues his report and recommendations.

A separate Order and Judgment consistent with this Opinion shall issue.

Date: 7  March, 2025

Royce C. Lamberth
United States District Judge

31