**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOEY STRAUSS et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.  1:22-cv-00052 (RCL)** |
| ) | |
| **ISLAMIC REPUBLIC OF IRAN,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## REPORT AND RECOMMENDATION OF THE SPECIAL MASTER RE: FSIA CLAIMS OF JOEY STRAUSS, JEAN CAMERON, AND JACOBUS STRAUSS

Joey Strauss, Jean Cameron, and Jacobus Strauss (the "Strauss Plaintiffs") seek compensatory damages pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for injuries sustained as a result of an EFP attack in Iraq on December 22, 2005 ("December 22 Attack") which resulted in the death of Johannes Strauss.  In accordance with the Administrative Plan Governing Special Masters, Federal Rule of Civil Procedure 53, and the Federal Rules of Evidence, the Special Master has received and reviewed testimonial and documentary evidence to assist in formulating and recommending those damages to which the Strauss Plaintiffs may be entitled.

## BACKGROUND

On December 22, 2005, Johannes Strauss was working in Iraq as part of a security detail for a United States government contractor when his vehicle was hit by an explosively formed penetrator ("EFP").  Johannes and another passenger were killed, and three others were wounded.  Second Am. Compl. ¶¶ 123–26, ECF No. 30; Mem. Op. at 12, ECF No. 33.

**PROCEDURAL HISTORY**

Plaintiffs filed their complaint on January 10, 2022 against the Islamic Republic of Iran ("Iran"), ECF No. 1, seeking compensatory damages under 28 U.S.C. § 1605A(c) for EFP attacks in Iraq on November 20, 2004, November 14, 2005, and December 22, 2005—acts facilitated by Iran and perpetrated by its proxies. Plaintiffs served Iran through diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4), on September 26, 2022. ECF No. 14. Iran's failure to file a response by the statutorily imposed deadline prompted plaintiffs to request entry of default, which the clerk entered on December 29, 2022. ECF No. 17.

On February 27, 2023, plaintiffs amended their complaint to reflect an administrative name change of one claimant. ECF No. 20. On June 8, 2023, plaintiffs moved for default judgment, ECF No. 21, which the Court denied without prejudice on March 28, 2024, citing three jurisdictional flaws, an Article III violation, and evidentiary insufficiency. ECF No. 23. Plaintiffs filed a second amended complaint on May 23, 2024, ECF No. 30, bringing claims against Iran for damages on behalf of the Estate of Johannes Potgieter and intentional infliction of emotional distress claims on behalf of the family members of those injured or killed in the EFP attacks in Iraq. Three days later, plaintiffs moved for default judgment as to liability, ECF No. 31, which the Court granted on March 7, 2025, simultaneously appointing the undersigned to serve as Special Master "to take evidence from the plaintiffs and calculate their damages." Mem, Op. at 2, ECF No. 33.

This Report and Recommendation focuses on the individual compensatory claims brought by the Strauss Plaintiffs against Iran for its complicity in the December 22 Attack.

**THE STRAUSS PLAINTIFFS**

**Joey Strauss—Johannes Strauss's Wife**

Joey Strauss supports her prayer for compensatory relief with a declaration dated May 16, 2024 ("JS-Decl.").

**Joey Strauss—Testimony**

Joey Strauss is over 18 and, at all relevant times, has been a South African citizen.  JS-Decl. ¶ 1.

Joey describes Johannes as a "soul mate" who comprised her "whole world."  *Id*. ¶ 4. They met while both serving in the South African police force, started a family together when Joey "was twenty-three, had two beautiful children, moved a few times, and bought a house." *Id*. ¶ 5.  Joey relied on Johannes "for everything: taking care of the children, emotional support, and financial provision."  *Id.* ¶ 6.

Johannes left the police force "[a]t some point," and following a brief stint working on a horse farm and nine months of unemployment, traveled "to Iraq to work as a bodyguard."  *Id*. ¶ 7.  He returned home "every three months for a few weeks at a time," and while his absence was difficult for Joey and their young children, they spoke daily online.  *Id*. ¶ 8.  Joey was "proud of him."  *Id*.

On the morning of December 22, 2005, Johannes attempted to contact Joey but could not get through.  *Id*. ¶ 10.  That afternoon, Joey's sister-in-law informed her that Johannes had been killed.  *Id*. ¶ 12.  Joey refused to believe it at first, unable to accept that "[e]verything [she] had with him evaporated in a second," especially since Johannes was only thirty-seven years old when he died" and "had a whole life waiting for him, a life with [her]."  *Id*. ¶¶ 12–13.

Joey's life "took a whole new turn" after Johannes's death, as she had "to adapt" to raising their children alone. *Id.* ¶ 14. Joey, at one point, consulted with a "physiologist" to assist the entire family, especially the children who, at six and nine years old, "did not always understand what was happening" and "held on to the thought that their dad would eventually come back." *Id.* ¶¶ 7, 15.

Joey resigned her position on the police force, not wanting to place herself at risk and chance her children being orphaned. *Id.* ¶ 16. She "never went back to work from the day of Johannes's death." *Id.* ¶ 17.

After Johannes's death, the "whole structure" of their family was altered, and "life was never the same again." *Id.* ¶ 21. Life became "chaotic" as Joey struggled to fill the role of mother and father and to "discipline, care for, and be there for [the children] in every way: physically, practically, financially, and emotionally." *Id.* To this day, Joey misses Johannes. *Id.* ¶ 23. He will never be out of their "minds or hearts." *Id.*

**Jean Cameron—Johannes Strauss's Daughter**

Jean Cameron supports her prayer for compensatory relief with a declaration dated May 10, 2024 ("JC-Decl.").

### Jean Cameron—Testimony

Jean Cameron is over 18 and, at all relevant times, has been a South African citizen. JC-Decl. ¶ 1. Jean was ten years old when her father was killed in Iraq. *Id.* ¶ 3.

Johannes was the one Jean could "talk to him about everything." *Id.* ¶ 4. To Jean, he "was such a loveable, caring, and kind person," "the most amazing dad," and "the glue . . . keeping everyone together." *Id.* ¶¶ 4–5. When on leave from Iraq, Johannes would gather the extended family for barbecues, where they would "laugh together and talk about all the things he

missed while he was away working." *Id*. And when he was overseas, the family spoke to him via webcam when possible. *Id*. ¶ 7.

Jean characterizes "the day [her] father died" as the "worst day of [her] life." *Id*. ¶ 8. She admits being "in denial" about his death, "both in the immediate aftermath of the tragedy and for a number of years after." *Id*. ¶ 9. Within hours of receiving the news, Joey, Jean, and Jacobus were joined by other members of Johannes's family "to try and make sense of it all." *Id*. ¶ 10. Jean's uncle explained to Jean that their father "was not coming back and that he was now with God in heaven." *Id*. "[B]eliev[ing] he would come back," Jean protested, insisting "they would discover it was someone else's body." *Id*.

Jean cried herself to "sleep every night for a few months" until her body "could not make tears anymore." *Id*. ¶ 11. "For three years," she was convinced her dad would return, until one day, she "snapped and started to act out." *Id*. ¶ 12. She began smoking and drinking in high school, "stopped eating completely[,] and was nearly anorexic." *Id*. ¶¶ 12–13. Worried her children "had bottled everything inside," Joey arranged for Jean and her brother to see a "psychologist to talk about [their] feelings." *Id*. ¶ 13.

The family spent the Christmas immediately following Johannes's death in mourning, and holidays have "never been the same" for Jean, who sees it as "more of a reason to remember [her] dad's passing than it is a time for celebration." *Id*. ¶ 15. After the December 22 Attack, Jean's "whole family scattered in different directions, both emotionally and physically." *Id*. ¶ 17. Jean and her brother "drifted apart for a while," and while she still spoke to her mother, Jean was "unable to open up to her the first few years." *Id*. ¶18.

Jean's "life will truly never be the same" without her father, and her grief has not diminished. *Id*. She speaks to Johannes, knowing he cannot hear her, and even tells her own

"daughter about him as much as [she] can." *Id*. Jean wishes she could tell her father about her husband, whom she believes Johannes "would have loved" given their similar personalities. *Id*. ¶ 19. She also wishes her father had met his "beautiful granddaughter" who is "strong-willed, loving, kind and fierce"—like him. *Id*. Jean's father will be her hero "until [she] breathes [her] last breath." *Id*. ¶ 20.

**Jacobus Strauss—Johannes Strauss's Son**

Jacobus Strauss supports his prayer for compensatory relief with a declaration dated May 11, 2024 ("JaC-Decl.").

**Jacobus Strauss—Testimony**

Jacobus Strauss is over 18 and, at all relevant times, has been a South African citizen. JaC-Decl. ¶ 1. Jacobus was seven years old when his father was killed. *Id*. ¶ 3.

Jacobus' relationship with his father was "that of a typical close father and son," spending "quality time together," playing and fishing. *Id*. ¶ 4. Jacobus recalls how Johannes would return from Iraq on leave bearing "lots of presents" and "eager to spend time together." *Id*. ¶ 5.

Jacobus learned his father had been killed three days before Christmas after the family had decorated their tree and wrapped Johannes's presents. *Id*. ¶ 7. Jacobus "initially could not comprehend or process it as reality." *Id*. ¶ 8. All he knew was that his father was never coming home, his mother "was suddenly sad all the time," and he "could not do anything to help her." *Id*. Jacobus's life "was never the same again." *Id*.

While their mother took Jacobus and Jean to see a psychologist to help them "grieve and work through the experience," and everyone in Jacobus's "support system did their best to help," "it never felt like enough." *Id*. ¶ 9. When he started high school "a few years later," Jacobus "was still very angry" and rebelled, leading to his near expulsion. *Id*. ¶ 10. He again consulted with a psychologist for "anger management therapy." *Id*.

After Johannes died, the "whole structure" of Jacobus's family "turn[ed] into chaos." *Id.* ¶ 11. His mother was a single parent, and Jacobus was without a father. *Id.* Joey left the police force, fearing something might happen to her. *Id.* ¶ 12. Jacobus now appreciates "that there were no easy decisions for her at that time." *Id.*

Johannes's absence "left a big gap" in Jacobus's life. *Id.* ¶ 15.

## ANALYSIS

Joey Strauss, Jean Cameron, and Jacobus Strauss seek compensatory relief under 28 U.S.C. § 1605A(c) for loss of solatium. Upon review of the evidence given the legal framework set out below, the Special Master considers the viability of their claims and the proper measure of any damages award.

## STANDARD OF PROOF

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner.'" *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (quoting *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. United States*, 967 F. Supp. 2d 246, 313 (D.D.C. 2013) (emphases in original) (*quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, a plaintiff must demonstrate entitlement to a "reasonable certainty" or a preponderance of the evidence and prove damages by a "reasonable estimate." *Hill v. Republic of Iraq,* 328 F.3d 680, 684 (D.C. Cir. 2003). For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C.

Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages. *Hill*, 328 F.3d at 684.

The quantum of proof necessary to trigger an award of damages "may be established by affidavit or declaration which, upon evaluation, the Special Master 'may accept plaintiffs' uncontroverted evidence as true.'" *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 85 (D.D.C. 2019) (quoting *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013)). *See Int'l Rd. Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 250 (D.D.C. 2001) (permitting plaintiffs to "prove both liability and damages . . . based on submission of affidavits, without the need for live testimony at a hearing") (citation omitted); *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015) (allowing plaintiffs to "establish the necessary proof for damages through affidavits or live testimony") (citation and internal quotation marks omitted).

## SOLATIUM DAMAGES
### (Joey Strauss, Jean Cameron, and Jacobus Strauss)

When awarding solatium damages, our courts recognize that family members in direct lineal relationship to the victims injured in a terrorist attack are "presume[d] . . . [to] suffer compensable mental anguish . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim*, 87 F. Supp. 3d at 290 (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015)). To maintain consistency, courts seek guidance in "prior decisions," *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008), and typically defer to the framework established in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), awarding $8 million for pain and suffering resulting from the death of a spouse, $5 million to a parent whose child was killed, and $2.5 million to a plaintiff whose sibling was killed, *id*. at 269 (footnotes omitted), and

*Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14 (D.D.C. 2012), establishing a baseline award of $3 million for children of a deceased victim. *See Roth*, 78 F. Supp. 3d at 403 (noting the *Heiser* "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror"); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85-86 (D.D.C. 2010) (noting "strong precedential support" for framework); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 49 (D.D.C. 2020) (observing that application of the *Heiser* framework avoids "the problem of disparity among the various state laws regarding the recovery of emotional distress by immediate family members").

Each member of Johannes Strauss's immediate family has presented credible testimony that compellingly evidences the close relationship they enjoyed with him and the despair and anguish they felt following his death in the December 22 Attack.

When Johannes died, Joey lost her "soul mate," and her "whole world" evaporated. She grieves that he died at such a young age with their whole lives before them. Joey had to adapt to being a single parent with all the associated financial and practical responsibilities. All three sought counseling to cope with their grief.

When her father died, Jean lost her "hero" and the man who kept the family together. Jean, who long denied his death, developed an eating disorder and succumbed to alcohol abuse. She admits her life will never be the same. Jacobus could neither comprehend nor process the reality of his father's death and watched helplessly as his mother grieved. Jacobus became angry and rebellious and now regrets the things he missed after losing the father with whom he was so close.

The evidence, only briefly recapitulated here, compellingly demonstrates the close relationship Joey, Jean, and Jacobus enjoyed with Johannes before his death and their anguish

losing "the mutual benefit that each family member receives . . . including love, affection, care, attention, companionship [and] comfort," *Wilson v. City of Chicago*, 758 F.3d 875, 883 (7th Cir. 2014), as a result of the attack.  The Special Master finds no exceptional circumstances warranting a deviation from the *Heiser* framework.  While each claimant has amply attested to the emotional anguish they experienced in the aftermath of the November 20 Attack, no enhancement is indicated.  The record reflects no "aggravating circumstances" such as "torture or kidnapping." *Greenbaum*. 451 F. Supp. 2d at 108, suggests no relationship between these claimants and Johannes beyond "the normal interactions to be expected given the familial relationship," *Oveissi*, 768 F. Supp. 2d at 26–27, and contains no "medical proof of severe pain, grief or suffering" on the part of any claimant.  *Roth*, 78 F. Supp. 3d at 403.

The Special Master, therefore, recommends that Joey Strauss receive $8 million and that Jean Cameron and Jacobus Strauss each receive $3 million in solatium damages.

## PREJUDGMENT AND POST-JUDGMENT INTEREST

Plaintiffs request prejudgment and post-judgment interest.  The Special Master recommends their request for prejudgment interest be denied for the reasons articulated in *Maupin*, 405 F. Supp. 3d at 88–98.

Post-judgment interest, however, is not discretionary given the plain language of 28 U.S.C. § 1961(a), providing that "[i]nterest *shall* be allowed on any money judgment in a civil case recovered in a district court," and § 1961(b) providing that interest "*shall* be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]" (Emphases added.)  *See Doe A-1 v. Democratic People's Repub. of Korea,* No. 18-CV-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) ("[A]n award of post-judgment interest under this statute is mandatory, not discretionary.").

The Special Master recommends the Court deny plaintiffs' request for prejudgment interest and award post-judgment interest at the statutory rate.

## PUNITIVE DAMAGES

Joey Strauss, Jean Cameron, and Jacobus Strauss seek punitive damages.  The FSIA provides for the award of punitive damages to punish and deter the actions for which they are awarded, *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 86–87 (D.D.C. 2021), and "[c]ourts routinely award punitive damages in cases brought under the terrorism exception to the Foreign Sovereign Immunities Act." *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020).  In *Estate of Bland*, the court relied on the Supreme Court's opinion in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), and applied a 3.44 ratio, noting that several courts had applied that ratio in FSIA cases.  831 F. Supp. 2d at 158 (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010)).  The Special Master recommends the Court award Joey Strauss, Jean Cameron, and Jacobus Strauss punitive damages applying the same 3.44 multiplier.

## CONCLUSION

For these reasons, the Special Master recommends Joey Strauss receive Eight Million Dollars ($8,000,000) and Jean Cameron and Jacobus Strauss each receive Three Million Dollars ($3,000,000) in solatium damages.

As plaintiffs' recommended compensatory damages total Fourteen Million Dollars ($14,000,000), the Special Master further recommends they receive punitive damages based on a 3.44 multiplier, yielding a punitive damages total of Forty-Eight Million One Hundred Sixty Thousand Dollars ($48,160,000).

Finally, the Special Master recommends prejudgment interest be denied, and post-judgment interest be awarded at the statutory rate.

Dated:  May 26, 2025                                    Respectfully submitted,

                                                       /s/ Alan L. Balaran
                                                       Alan L. Balaran, Esq.
                                                       Special Master